## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ELIYAHU MIRLIS, | : | CASE NO. 3:16-cv-00678 (MPS) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| RABBI DANIEL GREER and YESHIVA OF | : | |
| NEW HAVEN, INC., | | |
| Defendants. | : | JUNE 28, 2017 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION<br>FOR NEW TRIAL OR, IN THE ALTERNATIVE, FOR REMITTITUR</u>

Defendants Daniel Greer ("Greer") and Yeshiva of New Haven, Inc. ("Yeshiva")

(collectively "Defendants") respectfully submit this Memorandum of Law in support of their

motion, pursuant to Federal Rule of Civil Procedure 59(a), for an order granting a new trial in

this matter or, in the alternative, a remittitur of the jury's award of $15,000,000 in compensatory

non-economic damages entered against the Defendants on June 6, 2017.[1]  (Doc. # 163,

Judgment).  As we discuss below, the evidence presented at trial simply cannot support the jury's

exorbitant verdict in this case, which is dramatically out of step with non-economic damage

awards by juries in cases involving similar claims of sexual abuse, both in Connecticut and

throughout the country.  The Court should exercise its power under Rule 59(a), and either order a

new trial, or reduce the damage award to an amount substantially below $1 million.

---

[1] Because the Court's awards of $5,000,000 in punitive damages and $1,749,041.10 in offer of compromise interest
were a mathematical function of the jury's compensatory damages award, any new trial or remittitur of the
compensatory damages will necessarily decrease those sums as well. Accordingly, Defendants do not address
separately the award of punitive damages and interest.

## I.     Introduction

One bedrock principle of American jurisprudence is that cases must be decided based on fact and law – and not be influenced by extraneous forces such as sympathy, anger, or prejudice. This case featured key elements that increased the likelihood of such extraneous factors affecting (and infecting) the decision-making process.  First, the very nature of the claims – centering on sexual abuse – was likely to stir strong emotions with the jury.  Second, as noted in our pretrial motion *in limine*, the prospect of a civil defendant invoking Fifth Amendment rights, and having to do so in the presence of the jury, is rife with potential for undue prejudice.  These twin factors combined to create a legal tinderbox, with dramatically heightened risk of a result inflamed by passion, and untethered to the actual evidence presented in the case.

This volatile tinderbox unfortunately ignited in this case, resulting in the $15 million damage award returned by the jury.  The Court attempted to blunt the potential for unfair prejudice in its instructions, both during the trial evidence and at the conclusion of the case. However, despite the Court's best efforts, the jury returned an unprecedented verdict, unsupported by the evidence and far out of line with similar cases in Connecticut and other states.  In every case – even one where sexual abuse is alleged, and the defendant has invoked his constitutional privilege – the plaintiff bears the burden of proving his claims.  The evidentiary record in this case – which included undisputed testimony from plaintiff and his wife that he had repeatedly honored defendant Greer, insisting he play a critical part in the most important milestones of his life; had voluntarily and regularly involved himself in Greer's life from great distance, over many years; and had not displayed critical behaviors that plaintiff's own expert testified were essential to a valid diagnosis of Post-Traumatic Stress Disorder – simply cannot support an award of $15 million in non-economic damages.

The power vested in the Court under Rule 59, to grant a new trial or order a remittitur, is intended precisely to address situations like this, where a runaway verdict is returned that the cold record cannot support.  This case cries out for an exercise of that power.

## II.    Relevant Factual Background and Key Trial Testimony

As the Court is aware, this case arose from plaintiff Eliyahu Mirlis's ("Mr. Mirlis" or "Mirlis") claim that he was sexually abused and molested by Daniel Greer during plaintiff's sophomore, junior and senior years at Yeshiva (between the fall of 2002 and spring of 2005).  Mr. Mirlis further alleged that during this period of time, senior administrators and officials at Yeshiva, including Yeshiva's assistant principal, actually knew and/or should have known of the abuse and yet they did nothing to stop it.

Mr. Mirlis filed this case in May of 2016, 11 years after he graduated from Yeshiva. In his initial complaint, Mr. Mirlis sought damages for a claimed inability to lead and enjoy a normal life, physical pain and suffering, an inability to enter into and maintain physical, sexual and emotional relationships, and "permanent damage to his educational and career prospects and to his past, present and future earnings." (Doc. #1, Complaint, ¶¶29-31; 33).  Before trial, however, plaintiff amended his complaint to remove the claim for diminished earning potential and/or lost earnings, and at trial pursued only non-economic damages: an inability to enjoy life's activities and to engage in a normal life, and "mental, psychiatric and emotional injures". (Doc. #136, Third Amended Complaint, ¶¶29-32).  At the time of trial, Mr. Mirlis was 29 years of age, married, with three children.  He had a total life expectancy of 84.5 years.  (Transcript of Trial Testimony of May 15, 2017, Vol. II, p. 315, lines 12-13; p. 366, lines 17-21 (hereinafter "Tr. Vol II at____.").  Copies of the cited portion of this volume of trial testimony are attached hereto as Exhibit 2; Doc. #137, Stipulation re: Life Expectancy).

Mr. Mirlis's trial testimony included few specifics about the alleged abuse.  He testified in detail about the first alleged encounter between him and Greer, in which he said Greer kissed Mr. Mirlis on the lips.  (Tr. Vol. II at 319, line 18-320, line 25.)  Mirlis said generally that things "snowballed" between them over the next few years, until the two were engaging in a variety of explicit sexual activity, including oral sex.[2] (Tr. Vol. II at 321, lines 21-25).  The only other incidents described with any detail were an overnight stay in Paoli, Pennsylvania, and an outdoor encounter in Bethany.  Mr. Mirlis was unable to provide specific dates for any of the claimed incidents of abuse.  (Tr. Vol. II at 344, lines 14-18).  He testified that the frequency of encounters varied widely – weekly, he testified, during much of his 10th grade year, but in other periods, including the 11th grade, he said he avoided Greer's overtures for weeks at a time by saying, "no, I can't". (Tr. Vol. II at 325, lines 3-18).

Mr. Mirlis also testified that he enjoyed his time at Yeshiva, and felt happy and comfortable there. (Tr. Vol II at 331, lines 10-15; Tr. Vol. II at 332).   When asked why he did not report the alleged abuse at the time he said it occurred, Mr. Mirlis candidly responded,

> I wanted to finish high school out.  I didn't want to have to start at a new place.  I appreciated the education I was getting there.  I liked New Haven.  I liked Avi. I liked Ezi.  **I liked what was going on.  I liked the community as a whole and I was comfortable there.**    So I didn't want to start over.

(Tr. Vol II at 331, lines 10-15, emphasis added).

As the Court recalls, there was substantial evidence at trial of Mr. Mirlis's significant, continuing, and voluntary relationship with Greer following his 2005 graduation from high school.  Mirlis testified that in 2006, after having returned from a school year in Israel, he drove

---

[2] As the Court is aware, in light of a pending criminal complaint made by Mr. Mirlis, on the advice of counsel, Mr. Greer invoked his constitutional right under the Fifth Amendment to decline to respond to questions relating to the alleged abuse at trial. (Tr. Vol. II at 375, lines 21-25; Transcript of Trial Testimony given May 11, 2017, Vol. I, at p. 61, lines 22-24 (hereinafter Tr. Vol. I at ____.) Copies of the cited portions of this volume of trial testimony are attached hereto as Exhibit 1).

from New Jersey to Connecticut to have a sexual encounter with Greer in a motel in Branford.

(Tr. Vol. II, p. 340, lines 1-9).  Mr. Mirlis would have been 18 years of age in the summer of

2006.

Mirlis also testified to regular, ongoing contact with Greer that had absolutely no sexual

component.  Later in 2006, Mirlis's father passed away; he invited Greer to speak at the

traditional memorial service held 30 days after his burial.  (Tr. Vol. II at 353, lines 5-22).  When

he was married, in December 2007, Mirlis asked Greer to serve as one of the two most important

witnesses to the ceremony, under the wedding canopy – a position of great honor and ceremonial

significance.  (Tr. Vol. II at 353, line 23-355, line 2).  When his first child, a boy, was born in

2010, Mirlis chose Greer to serve in the two most important roles at his son's circumcision

service - making Greer "the most important person" at that event. (Tr. Vol. II at 362, line 3-364,

line 7).  In addition, Mirlis traveled from New Jersey to New Haven to visit Greer on many high

holy days and other religious holidays for 8 years following his graduation, and brought his wife

and children with him on those trips.  (Tr. Vol. II at 364, line 3-p. 365, line 12; p. 366, lines 14-

24). On some of these visits, Mirlis participated in religious services with Greer, standing next to

Greer as he conducted the services. (Tr. Vol. II at 366, lines 1-11).

When asked why he continued to seek out Greer to be part of his life, Mirlis responded,

"I looked up to him as an important figure in my life…I felt it was appropriate for what he had

done for me by education and, you know, whatnot, helping me financially when he did." (Tr.

Vol. II at 332, lines 9-13).  He also testified that he never expressed a desire to "get away from

[Greer]." (Tr. Vol. II at 362, lines 1-2).

Shira Mirlis, plaintiff's wife, corroborated Mr. Mirli''s testimony regarding his ongoing

involvement with Greer after 2006.  She recalled an average of 6 to 8 visits each year from their

home (either New York or New Jersey) to New Haven.  (Tr. Vol. I at p. 162, lines 22-23). These

included overnight trips for the high holy days or Sabbath.  (Tr. Vol. I at . 163, line 2-p. 165, line

18).  Mrs. Mirlis objected to the repeated trips to see Greer and other members of the New Haven

community; she and her husband fought "non-stop" about the trips, "[e]very single time, the

entire ride up".  (Tr. Vol. I at p. 145, lines 2-17).  She also admitted that she did not want Greer

to even be present at their 2007 wedding, but her husband insisted on him serving in the role of

honor; the same was true of the positions of honor at the circumcision ceremony in 2010. (Tr.

Vol. I at p. 155, line 9-p. 157, line 21). In general, she found her husband's ongoing relationship

with someone who supposedly had abused him as a minor to be "weird" and "strange". (Tr. Vol.

I at p. 145, lines 2-4; Tr. Vol. IIat p. 178, lines 19-20).

 Plaintiff's testimony regarding his claimed emotional distress and suffering – the sole

basis of his damage claim - was sparse at best.  His entire discussion of the topic spans less than

one page of transcript; it consists of only four pairs of questions and answers.  First, Mr. Mirlis

was asked how Greer's alleged abuse affected his relationship with his wife.  He responded:

> We have and continue to have our ups and downs.  It doesn't allow me to, I guess, you
> know, connect with my wife how I'm supposed to.  I hold everything very close to the
> vest.  And I'm very, you know, everything's all good all the time, but I'm unable to share
> with her how it's supposed to be.

(Tr. Vol. II at 333, line 24-334, line 4).  Second, Mr. Mirlis was asked whether he can share with

anybody.  He responded with a simple "no." (Tr. Vol. II at 334, lines 5-6).  Next, Mr. Mirlis was

asked if there was anyone he could trust, to which he responded, "I don't trust anybody.  I

second guess everybody and anybody." (Tr. Vol. II at 334, lines 10-11).  Finally, he was asked

what he sees as his future with his wife and children.  He answered, "[a]n uphill climb.  You

know, we've been married just about 10 years and we've had our ups and downs and we've

fought through it.  And I'm sure we will continue to have ups and downs and continue to fight through.  It's definitely not easy." (Tr. Vol. II at 334, lines 16-20)[3].  These four short exchanges are the entirety of what the jury heard from the plaintiff regarding his claimed emotional pain and suffering, and "inability to lead a normal life", for the past 12 years as well as into the future.

Mr. Mirlis's testimony was also noteworthy for what it did <u>not</u> include.  He said nothing about (and claimed no damages for) having received treatment for his claimed trauma – beyond acknowledging that he had not done so until October 2015, after retaining counsel.[4]  (Tr. Vol II at p. 370, lines 18-25).  He did not even attempt to explain the reasons behind his failure to seek treatment – even though his wife indicated she had urged him to do so for at least 8 years.  (Tr. Vol. II at p. 182, lines 10-15).  He also did not testify as to any plans to seek treatment in the future.  Finally, beyond the limited testimony discussed above, he said absolutely nothing about how his supposedly permanent, debilitating traumatic condition had affected, or was affecting, his life.[5]

Plaintiff attempted to bolster his damage claims through the testimony of psychologist Julian Ford, a hired expert in Post-Traumatic Distress Disorder ("PTSD").  Dr. Ford, who rendered no treatment to Mr. Mirlis, and who was engaged solely to conduct a forensic examination and offer testimony, opined that Mr. Mirlis suffers from PTSD, had been suffering from it from 2005 (or earlier), and likely would continue to be afflicted by the condition.

---

[3] Plaintiff's wife, Shira Mirlis, also described her relationship with her husband.  That testimony adds nothing new to the record as regards plaintiff's damages.  Mrs. Mirlis simply echoed her husband's sentiment that plaintiff is not emotionally intimate or vulnerable, and that their relationship is "not satisfying." (Tr.Vol. I, p. 149, lines 17-22; p. 150, lines 12-19). However, she also professed great love and respect for her husband, describing him as "a very good person. He has an amazing heart. He is selfless, kind, strong. He's just a very good person." (<u>Id</u>. at 152, lines 23-25).

[4]  Plaintiff did mention having sought marital counseling with his wife. (Tr. Vol. II at p. 379, lines 2-5).

[5]  In particular, as discussed below, plaintiff did not testify to many of the behaviors/symptoms upon which his expert witness based his diagnosis of Post-Traumatic Stress Disorder.

Dr. Ford's testimony suffered from several flaws, however.  First, by his own admission, his opinions rested on an assumption that Mirlis was telling him the full and complete truth.  The evidence at trial showed that, in many important areas, Dr. Ford did not have the full and complete truth from the plaintiff – a flaw that Dr. Ford conceded could undermine the validity of any professional conclusions.  (Tr. Vol. II, p. 275, line 3-p. 276, line 3).  For instance, it was Dr. Ford's understanding that the plaintiff "saw [Greer] occasionally in public events at the school".  (Tr. Vol. II, p. 291, lines 11-18).  This statement, which Dr. Ford indicated came from Mirlis, is simply false; it is clear Dr. Ford had no knowledge about the honored roles plaintiff chose for Greer in his wedding and the circumcision of his child, or even his dozens of long trips to New Haven for high holy days, Sabbaths, and other occasions.  Dr. Ford also was under the mistaken impression that Mirlis had only recently told his wife of his claimed history of abuse; both Mr. and Mrs. Mirlis testified to the contrary.  (Tr. Vol. II, p. 293, lines 3-25; *id*. at p. 340, lines 10-21; *id*. at p. 183, line 23-p. 184, line 4).  Thus, Dr. Ford was also unaware that Mirlis insisted, over his wife's objections, on continuing to visit Greer, and honor him, over such a long period of time.  Indeed, Mirlis freely admitted that he did not share full information with Dr. Ford; as he cavalierly stated:  "If he didn't ask me, then I did not tell him".  (Tr. Vol. II, p. 377, line 3). The lack of complete knowledge, as we discuss in the Argument section below, vitiates Dr. Ford's testimony – regardless of his expert credentials.

In addition, apart from any credibility issues, many bases for Dr. Ford's PTSD diagnosis find little support in the factual record.  Put simply, the Eliyahu Mirlis described at trial by Dr. Ford is difficult to reconcile with the individual who actually testified.  For instance, Dr. Ford stated that on a daily basis, Mr. Mirlis experienced unwanted or intrusive memories of the abuse that range from flashbacks to "just a vague feeling that something terrible is happening or will

happen" (Tr. Vol. II at 254, line 19-p. 255, line 9); Mr. Mirlis did not testify to any such memories or flashbacks (even when frequently in Greer's presence).  He said that Mirlis experiences feelings of depression, anger, self-loathing and disgust for himself (Tr. Vol. II at 255, lines 9-12); Mirlis articulated no such feelings in his trial testimony.  Dr. Ford further stated that Mr. Mirlis feels "shaky, trembling, heart racing, heart pounding" (Id. at lines 18-19); again, Mirlis himself said nothing about <u>ever</u> having experienced such physical symptoms, for instance, during one of the many times he was in Greer's presence after 2005.

Finally, Dr. Ford testified that one of the required behaviors which must be present in order to make a valid PTSD diagnosis was avoidance of reminders of the traumatic event(s).  (Tr. Vol. II, p. 292, line 15-p. 293, line 2; *id*. at p. 306, lines 10-16).  Without evidence of such behavior, one cannot accurately make a PTSD diagnosis under the applicable diagnostic manual, DSM-V.  Dr. Ford opined that plaintiff met this criterion – yet was under the impression, based on statements by the plaintiff, that since the claimed abuse ended Mr. Mirlis had seen Greer only occasionally, at public events at the school.  The factual flaws underlying that are, as we discuss below, fatal to the credibility of Dr. Ford's opinion.

## III.     Law and Argument

### A.     <u>General Legal Standard</u>

Federal Rule 59(a) (1)(A) provides that after a jury trial, a district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  A new trial "must be granted if the court determines that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Santa Maria v. Metro–North Commuter R.R*., 81 F.3d 265, 273 (2d Cir. 1996).  A jury verdict is excessive if it is "so high as to 'shock judicial conscience.'" *Pace v.*

*Nat'l R.R. Passenger Corp.*, 291 F. Supp. 2d 93, 104 (D. Conn. 2003), *quoting Schneider v. Nat'l R.R. Passenger Corp.,* 987 F.2d 132, 137-38 (2d Cir.1993).

The decision to grant a new trial is "committed to the sound discretion of the trial judge." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992). A trial judge hearing a motion for a new trial under Rule 59 is free to weigh the evidence and need not view it in the light most favorable to the verdict winner. *Grisanti v. Cioffi*, No. CIV399CV490JBA, 2001 WL 777435, at *3 (D. Conn. June 14, 2001), aff'd, 38 F. App'x 653 (2d Cir. 2002); *Song v. Ives Labs., Inc.*, 957 F .2d 1041, 1047 (2d Cir.1992).

If a trial court does find that the amount of damages awarded is excessive in light of the evidence presented, it may order a new trial, order a new trial as to damages, or "under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir.1995).  A remittitur compels a plaintiff to choose between reduction of an excessive verdict and a new trial. *Chopra v. Gen. Elec. Co.*, 527 F. Supp. 2d 230, 244 (D. Conn. 2007), *citing Cross v. New York City Transit. Auth.*, 417 F.3d 241, 258 (2d Cir.2005); *accord Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (district court's discretion to grant new trial includes "ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)."). "Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir.2014).

In considering a motion for a new trial or remittitur as to a state law claim, "[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial

or remittitur should be ordered." *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 375 (D. Conn. 2016), appeal dismissed (Aug. 16, 2016); *see also Munn v. Hotchkiss Sch.*, 795 F.3d 324, 335 (2d Cir. 2015).  Under Connecticut law, "[i]f the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it *shall* order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial." Conn. Gen. Stat. § 52-216a (emphasis added).  "The claim that the amount of a verdict is excessive raises a question of law and not of fact." *Champagne v. Raybestos-Manhattan*, 212 Conn. 509, 556 (1989).

In *Saleh v. Ribeiro Trucking, LLC,* 303 Conn. 276, 280-82 (2011), the Connecticut Supreme Court fleshed out our state's remittitur standard, stating:

> The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption ....
>
> We have explained the reason underlying the great breadth of the trial court's discretion over such matters: There are, to be sure, sometimes, verdicts of this kind, when the trial judge is required by the interests of justice to set them aside.... This power of supervision and correction which the judge has over the verdict is an essential part of the jury system.  (Citations omitted; internal quotation marks omitted.)

The court's "broad power to order a remittitur should be exercised only when it is manifest that the jury [has] included items of damage which are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." *Id.* at 281 (internal quotation marks and citations omitted); *accord Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117–18 (2d Cir.2004). Thus, an essential component of the court's analysis, particularly of a non-economic damages award, is whether a plaintiff has provided evidence sufficient for the

finder of fact to make a fair and reasonable estimate of those damages.  *See Willow Springs Condominium Ass'n, Inc. v. Seventh BRT Development Corp.* 245 Conn. 1, 59 (1998).

In making decisions regarding non-economic damages, the jury is not entitled to punish the Defendant or be generous to the Plaintiff. *Burrell v. Yale University*, 2004 WL 3049083 (Conn. Super. Nov. 22, 2004) (Schuman, J.). Our law has long prohibited juries from basing a verdict on sympathy.  *Atchison v. Lewis*, 131 Conn. 218 (1944).  Because "awards for mental and emotional distress are inherently speculative and the judicial system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable and proportionate, greater scrutiny is given to large jury awards for mental and emotional harm to ensure that they are in line with comparable cases". *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 376 (D. Conn. 2016) (internal quotations omitted).

When a verdict is excessive as a matter of law, the amount of the remittitur rests largely within the discretion of the trial court. "[I]n ordering a remittitur, the court is obligated to determine damages de novo and not merely bring the verdict just 'within the ballpark.'" *Cohen v. Yale-New Haven Hosp.*, 2000 WL 1337660, *25 (Conn. Sup. Aug. 31, 2000) (Levin, J.). If this Court decides to order a remittitur, it should not be to the highest number the jury could legitimately have awarded; the remittitur should be to the amount the Court believes is the proper one.  *See Grisanti v. Cioffi*, No. CIV399CV490JBA, 2001 WL 777435, at *8 (D. Conn. June 14, 2001), aff'd, 38 F. App'x 653 (2d Cir. 2002) (ordering remittitur of jury's award of $2.5 million in non-economic damages for four incidents of sexual assault on an adult woman by her former partner who was the father of her child to $1.25 million).  "In the ordering of a remittitur, a fair appraisal of compensatory damages, and not the limit of legitimate generosity, is the rule." *Buckman v. People Exp., Inc.*, 205 Conn. 166, 177 (1987).

### B.    Relevant Precedents in Connecticut and Other States

The question whether to order a new trial is not guided solely by the general legal standards discussed above.  Instead, under both the Rule 59 and state law analysis, "a court should look to awards in comparable cases, bearing in mind the unique facts and circumstances of each case." *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 375–76 (D. Conn. 2016), appeal dismissed (Aug. 16, 2016); *Wood v. Bridgeport*, 216 Conn. 604, 611 (1990); *see also Scala v. Moore–McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir.1993) (*quoting Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988)) (when evaluating whether an award is excessive, "courts have reviewed awards in other cases involving similar injuries, 'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'")  We discuss below numerous precedents, both from Connecticut and other jurisdictions, that we believe help illustrate the extreme nature of the damage award in this case.

In *Doe v. Archdiocese or Hartford et al.*, Docket No. UWYCV-08-5010702-S (Conn. Super.), plaintiff contended that when he was a 13 and 14-year old grammar school student at one of the defendant's parochial schools, he was subjected to multiple incidents of sexual abuse by a priest, who was also the director of his school. The plaintiff contended that another altar boy and he were repeatedly molested by the priest and the priest's friend over an approximate two-year period, including in the school's locker rooms, in the school's basement where supplies were kept, at sleepovers in the school rectory, and at sleepovers at the home of the priest's friend. *Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 367 (2015).  Much like claims made by Mr. Mirlis, the plaintiff in *Doe* described the abuse and molestation as consisting of voyeurism, oral sex, fondling of genitals, the forced viewing of pornography, and culminating in the priest sodomizing him in the basement of the school. *Doe*, 317 Conn. at 367.

The plaintiff contended that he suffered PTSD that was manifesting in anxiety, depression, nightmares and flashbacks of the incidents. *Doe v. Hartford Roman Catholic Diocesan Corp.,* 27 N.Eng. J.V.R.A. 8:C7, 1000 WL 181316 (2015). The plaintiff's psychotherapist testified that the plaintiff continues to feel guilt and shame about the incidents. (*Id*.) The plaintiff's psychologist/PTSD expert contended that the plaintiff will require psychotherapy for the foreseeable future and that it is likely that he will continue to suffer the effects of the disorder to some degree, permanently.  (*Id*.)  Accordingly, in *Doe*, the jury was presented with corroborated evidence of long-lasting and intrusive emotional harm suffered after two years of repeated sexual abuse by a trusted religious advisor and school administrator, as well as by a second perpetrator, while the plaintiff was roughly the same age as Mr. Mirlis claims he was when abused.  On the basis of this corroborated testimony, the jury found for the plaintiff and yet awarded him only $1,000,000 in compensatory damages.  *Doe v. Hartford Roman Catholic Diocesan Corp.,* 317 Conn. at 360.

In *Blair v. LaFrance*, No. CV 980149622S, 2000 WL 1508232, at *2–5 (Conn.Super.Sept. 27, 2000), a female plaintiff brought suit against her uncle alleging that he sexually molested her on three occasions when she was 8, 12 and 14 years old.  The first two incidents of sexual abuse occurred in the plaintiff's own bed; the third on a family vacation. Plaintiff brought claims sounding in negligent infliction of emotional distress, invasion of privacy, intentional infliction of emotional distress and assault and battery.

At trial, the plaintiff in *Blair* testified to myriad symptoms following the abuse.  She testified that she was significantly depressed, anxious and fearful and had attempted suicide; testified that she slept in sweat pants and a sweat shirt and always slept away from the door and against the wall; and that she had extremely low self-esteem and a history of an eating disorder.

She also testified that she "hates herself" following the abuse; had high degrees of rage and distrust;  and exhibited those feelings by being short- tempered and yelling at her husband and young daughter.  She testified to obsessive compulsive behaviors, and said she had been seeking therapy since she first disclosed the sexual abuse to her husband several years before the trial.

The plaintiff's expert witness confirmed and corroborated these claims, and, based upon two evaluative interviews, opined that the *Blair* plaintiff suffered from depression, anxiety and PSTD.  Plaintiff's expert also testified that it is rare for a sexual abuse victim to ever be fully cured and that normally, a sexual abuse victim needs seven to ten years of weekly therapy to work through her issues and also often needs antidepressant medication.

Based upon these facts and this corroborated testimony, the trial court awarded plaintiff $75,200 for economic damages and $500,000 for non-economic damages.  At the time of the trial, the plaintiff in *Blair* was 30 years old and had an additional life expectancy of approximately 50 years.

In *Srb v. Johnson*, No. MMXCV085004782, 2009 WL 5730549, at *1 (Conn. Super. Ct. Dec. 28, 2009), the plaintiff alleged that over a period of approximately six months to a year, when the plaintiff was about fourteen to sixteen years of age, the defendant, a horse trainer, sexually assaulted the plaintiff on approximately five occasions at a horse stable where plaintiff was taking horseback riding lessons. The sexual assault included sodomy and restraint of the plaintiff.  At trial, the evidence disclosed that the plaintiff had been a student of the defendant for a number of years in his youth. The plaintiff maintained that he was extremely interested in horseback riding, that the defendant appeared to be an authority figure and contended that the defendant utilized this status as a trusted expert and authority to take advantage of him.

ANDREW SRB vs. ROBERT L. JOHNSON AND QUARRY TOWN STABLES INC., 26 N.Eng. J.V.R.A. 3:C2, 1000 WL 181253 (2015).

As a result of this sexual assault, the plaintiff testified that he was significantly traumatized and suffered, and continued to suffer, significant psychological injuries including alcohol dependence, a history of opiate dependence, depression, emotional distress, shame, embarrassment, anxiety, an inability to maintain regular employment, insomnia, nightmares, flashbacks, relationship problems, loss of enjoyment of life's activities and impaired social functioning. He indicated that all of these conditions required, and continued to require, in depth inpatient and outpatient mental health treatment, hospitalization and counseling. He was diagnosed with post-traumatic stress disorder, alcohol dependence and a history of opiate dependence. *Srb*, 2009 WL 5730549, at *1; 26 N.Eng. J.V.R.A. 3:C2. The jury in *Srb* awarded the plaintiff $1,270,000 in compensatory damages. 26 N.Eng. J.V.R.A. 3:C2.

In *Doe v. Thomas Valley Council for Cmty. Action, Inc.,* No. X04CV 930115438S, 2000 WL 254608, at *3 (Conn. Super. Ct. Feb. 23, 2000), *aff'd sub nom. Doe v. Thames Valley Council for Cmty. Action, Inc.,* 69 Conn. App. 850, 797 A.2d 1146 (2002), a Connecticut jury awarded both economic and non-economic damages to four very young children who were sexually assaulted by their van driver while enrolled in a Head Start day care program.[6]

At trial plaintiffs' expert, who evaluated all four minor children, testified that the defendant's sexual abuse, with reasonable medical probability, will have a profound, long-term psychological impact on the thinking and emotions of the children and on their approach and reactions to relationships. According to that expert, at certain critical life junctures, such as puberty and adolescence, the children will be at great risk for the development of an assortment

---

[6] Plaintiff's expert, Dr. Ford, testified that the most detrimental time periods to suffer sexual abuse are early childhood and adolescence, making this case analogous in its severity to the allegations in the case at bar. (Tr. Vol. II at 296, lines 3-8).

of mental, emotional and relationship disorders.  The expert opined that relationship problems will continue throughout their adult lives, and the children's injuries were considered to be permanent.  A need for treatment and the disastrous consequences of problems left untreated were also mentioned.  Based on this evidence of permanent and wide-ranging psychological damages, the jury awarded economic damages ranging from $30,000 to $60,000 per child, and non-economic damages ranging from $35,000 to $75,000 per child.

In *Andalora v. Falanga*, Docket No. CV125005758S (Conn. Super.), the plaintiff, now 47 years old, alleged that in the 1980s, when she was a child, the defendant, who was dating her mother at the time, repeatedly sexually abused her over a period of seven years. ANDALORA vs. FALANGA, 32 N.Eng. J.V.R.A. 1:15, 2014 WL 12538902.  The *Andalora* plaintiff claimed she suffered emotional distress, depression and developed low self-esteem, an eating disorder and addiction issues as a result of the years of abuse. The defendant denied the allegations and disputed both causation and damages.  At the conclusion of the trial, the jury returned a verdict in favor of the plaintiff in the amount of $2,750,000. The verdict consisted of $70,000 in economic damages and $2,680,000 in non-economic damages.

In *Powell v. Fabbozzi*, 2005 WL 4721673, No. CV02 039 33 64S (Conn.Super. 2005*)*, a 43-year-old male alleged that he suffered emotional distress after he was sexually assaulted, abused, and molested from ages 9-13 at a church by the 76-year-old male defendant. *See Powell v. Fabbozzi*, JVR No. 1008130022, 2005 WL 6522254 (Conn.Super.) (Verdict and Settlement Summary). The defendant denied liability.  The jury awarded the plaintiff $3,000,000 in non-economic damages for his pain and suffering. *Powell v. Fabbozzi*, 2005 WL 4721673 at *1. With compensatory damages, punitive damages and interest, the total verdict in that case exceeded

$9,000,000. However, the non-economic damages portion only comprised approximately 1/3 of the total amount awarded.

The only Connecticut case our research has revealed that even comes close to the verdict returned in this case was the recent case of *Doe v. Boy Scouts of America Corporation*, 323 Conn. 303, 315, 147 A.3d 104, 111, reconsideration en banc denied, 323 Conn. 942, 151 A.3d 841 (2016). In that case, plaintiff brought suit against the Boy Scouts of America for sexual abuse he suffered at the hands of Hepp, a Boy Scout patrol troop leader during the mid-1970s. Hepp sexually abused the plaintiff on three separate occasions, all of which involved forced oral or anal sex. *Doe v. Boy Scouts of Am. Corp.*, 323 Conn. at 310–11.

Years later, the plaintiff brought suit alleging that he had suffered physical, emotional and psychological injuries as the result of the sexual assaults, and that the defendant organization was liable for his damages because it had negligently failed to take adequate steps to prevent his injuries. In addition, the plaintiff alleged that the defendant had negligently inflicted emotional distress, that its conduct was reckless and that its conduct constituted a CUTPA violation. *Id*. at 311.

At trial, the plaintiff's theory was that the Boy Scouts organization had been negligent because, even though it had been aware of numerous incidents of sexual abuse during scouting activities in the decades preceding the 1970s, both by adult and by minor Boy Scout participants, it failed to take appropriate precautions against sexual abuse. In support of his claims, the plaintiff presented expert testimony by an associate professor of family studies and human development, with special expertise in the subject of institutional responsibilities for keeping children safe. The expert testified that, in his opinion, the defendant's failure to inform the public about the risk of sexual abuse during Boy Scout activities created a dangerous situation for

members of the Boy Scouts and was negligent. In addition, a clinical psychologist with expertise

in helping institutions set up programs to prevent sexual abuse in institutional settings, testified

that, on the basis of his review of the ineligible volunteer files, it was his opinion that the

defendant must have been aware before the mid-1970s of incidents of sexual abuse of members

of the Boy Scouts by fellow members. *Id*. at 311–12.

On the basis of this evidence, the jury in *Doe* returned a verdict for the plaintiff on all

counts and awarded $4 million in compensatory damages on the plaintiff's negligence claim and

$3 million in compensatory damages on the claim of negligent infliction of emotional distress.[7]

After including CUTPA damages, attorneys' fees and interest, the total damages award reached

$11,854,166.11. *Id*. at 314.

Relevant precedent from other jurisdictions also highlights the exorbitant nature of the

verdict in this case.  In *B.K. v. Kelley*, 89 Mass. App. Ct. 1127, 51 N.E.3d 510, <u>review denied,</u>

475 Mass. 1103, 60 N.E.3d 1172 (2016), the defendant admitted that he sexually molested and

abused his two daughters on thousands of occasions. He molested one daughter approximately

three to five times per week when she was between the ages of twelve and fifteen, and continued

to molest her on various occasions when she was sixteen and seventeen years old. Similarly, the

defendant began molesting his other daughter when she was twelve, and continued to do so

through her middle school and high school years. The abuse happened almost every night unless

the defendant was away.

Both daughters testified extensively about the impact, devastation, and emotional distress

caused by the years of abuse from the defendant. The plaintiffs' expert, a forensic psychiatrist,

testified that in his opinion, to a reasonable degree of medical certainty, both daughters suffered

---

[7] We have been unable to determine what portion of the damage award was non-economic. For purposes of this
motion, we have assumed that the full $3 million awarded for negligent infliction of emotional distress consisted of
non-economic damages.

emotional injuries caused by the defendant's sexual abuse. He opined that the sexual abuse caused the plaintiffs' depression, anxiety, suicidal ideation, and problems with sexual relationships.  On the basis of this evidence, the jury awarded the plaintiffs $1.5 million each on their claims for assault and battery and $3.5 million each on their claims for intentional infliction of emotional distress, for a total award of $5,000,000 for each woman following *thousands* of *admitted incidents* of sexual abuse and molestation at the hands of the most trusted adult in their lives—their own father.  *B.K. v. Kelley*, 89 Mass. App. Ct. 1127 at *1.

In *Mrozka v. Archdiocese of St. Paul & Minneapolis*, 482 N.W.2d 806, 810 (Minn. Ct. App. 1992), a former parishioner sued the Archdiocese and Diocese (collectively, the "Church"), alleging that they negligently allowed a priest, with a documented history of child sexual abuse, to sexually abuse him over a period of years when he was a minor.  The Church admitted negligence. The jury awarded Mrozka $855,000 in compensatory damages and $2,700,000 in total punitive damages (which, in that jurisdiction, are used to punish and deter the same or similar conduct). Finding this verdict <u>excessive</u>, the trial court remitted the punitive damages award to approximately $187,000, for a total award of just over $1,000,000 after years of *admitted sexual abuse* by a religious leader.

Similarly, in *DeLucia v. Great Stuff, Inc.*, No. CV N13C-02-009 FSS, 2015 WL 5157127, at *1 (Del. Super. Ct. Apr. 10, 2015) the trial court ordered a remittitur of a jury award of punitive damages against two men.  In *DeLucia*, the plaintiff alleged that when he was 17 years old, he was given alcohol and drugs and then sexually abused and assaulted by his 49 and 33 year old male bosses on five to ten occasions.  Some of these assaults spanned 8-10 or more hours.  Because he was under the influence of drugs and/or alcohol during the assaults, the plaintiff had very little recall of what was done to him.  However, the plaintiff in *DeLucia*

nonetheless testified that because of what the defendants did, he felt disgusted, and he became resentful, confused, and more reclusive. Further, he "spent a lot of time in [his] own head." Plaintiff described his emotional condition as inner turmoil; he hated himself and struggled every day with the events.

On the basis of this evidence, the jury awarded a collective total of only $80,000 in compensatory damages. The jury also awarded punitive damages: $200,000 each against individual defendant and $100,000 against the company they controlled. Finding this punitive damages award excessive, the court reduced it to a total of $240,000. *DeLucia*, 2015 WL 5157127, at *4.

**C.     The Jury's Award of $15,000,000 in Non-Economic Damages Was So Excessive as to Shock the Judicial Conscience and Requires a New Trial**

The jury's award of $15 million in non-economic damages in this case should not be allowed to stand.  The magnitude of the verdict is unsupported by the evidence, and grossly out of line with similar awards in other sexual abuse cases in Connecticut and elsewhere.  It can only be understood, or explained, as the product of understandable (but impermissible) emotion, anger and prejudice, triggered by the nature of the allegations in the case and defendant Greer's invocation of his constitutional rights in the jury's presence.  Under the authorities discussed above, the Court has plenary power to remedy this wrong; indeed, this is exactly the type of situation that calls out for the Court's power to regulate "runaway" juries.  In order to prevent a miscarriage of justice, the Court should exercise that power, and either order a new trial outright, or order a remittitur to an amount substantially below $1 million in damages.

Two general points of law noted above bear repeating.  First, under the *Grisanti* and *Song* cases, the Court is free to weigh the trial evidence afresh, and is <u>not</u> required to construe it in the

light most favorable to the plaintiff.  Second, the applicable authorities in certain instances impose mandatory, not discretionary, obligations:  the *Santa Maria* case from the Second Circuit speaks of how a new trial "must" be granted if a verdict is against the weight of the evidence, and the applicable Connecticut statute, Section 52-216a, provides that a remittitur "shall" be ordered if a verdict is excessive as a matter of law.

It is impossible to reconcile the trial record with a conclusion that Mr. Mirlis suffered $15 million in "fair, just and reasonable" non-economic damage; that amount should "shock the judicial conscience".  Mr. Mirlis stated that he was sexually assaulted, against his will, multiple times over a period of three years.  Yet he also freely admitted continuing to associate regularly with his alleged abuser for many years after he said the abuse ended, traveling great distances with his young family in order to do so.  He insisted, over his wife's repeated objections, not just on making dozens of visits to Daniel Greer and the New Haven community, but also on honoring him with vital roles in the most important events of his life.  The incongruity of this behavior could fairly lead one to question whether the claimed abuse had occurred at all; no testimony, expert or otherwise, was offered to attempt to explain plaintiff's post-high school insistence on continuing to associate with, and honor, Greer.  At minimum, however, it raises a critical question:  Based on his admitted behavior between 2005 and the present, how much emotional damage could plaintiff reasonably have suffered?

We expect that plaintiff's position will be similar to the argument made to the jury in closing – essentially, that this case involves sexual abuse, and that no amount of money is too high to compensate someone in Mr. Mirlis's position.  That is not the law, however; the Court must review the jury verdict in light of the evidence in the case, and a plaintiff has the burden of proving his damages.  As discussed above, the only testimony from the plaintiff as to his own

pain and suffering was that he is emotionally closed, that he is distrustful of others, and that his marriage is an "uphill climb" (which can be said of many marriages, regardless of whether one spouse has suffered sexual abuse). (Tr. Vol. II at 333, line 24-334, line 20).  Mr. Mirlis also conceded that in many ways, he is leading a normal or even above-average life.  He testified that he is a successful business man and owner of several businesses, that he owns his own home, and that he adequately supports his family. (Tr. Vol. II at 372, line 15-373, line 6). His wife spoke about him with great love and respect, calling him "a very good person. He has an amazing heart. He is selfless, kind, strong. He's just a very good person." (Tr. Vol. II at 152, lines 23-25).  He has three children, and was emotionally present and overcome with love at their births. (Tr. Vol. I at 152, lines 6-13).  All told, this evidence paints a picture of a man who, even if one credits his claims of abuse (as the jury did), has recovered remarkably well.  It certainly does not support a finding that, as claimed in the complaint, the plaintiff is unable to lead and enjoy a normal life.

Dr. Ford's testimony also cannot support a finding of $15 million in fair, just and reasonable non-economic damages.  As discussed above, the credibility of Dr. Ford's conclusions is fatally undermined by the flawed information on which he reached those conclusions.  It was crystal-clear from his testimony that he lacked critical information about the Greer-Mirlis relationship between 2005 and the start of this lawsuit – and that plaintiff's lack of candor, or openness, was to blame for that lack of information.  Dr. Ford opined that Mr. Mirlis had suffered daily from potentially debilitating PTSD symptoms, including unwanted memories and avoidance behavior, since 2005 or before, but the record flatly contradicted the factual assumptions critical to that opinion.  Dr. Ford conceded that the "garbage in, garbage out" phenomenon applied to the type of forensic analysis he undertook in this case, and that if a subject is not candid, flawed conclusions can result.  We urge the Court on this basis to dismiss

Dr. Ford's testimony in its entirety, or at minimum accord it minimal weight in assessing the basis for the jury award.

While we believe that a new trial is warranted simply based on the shortcomings in this trial record, the history of awards in comparable cases provides a further basis to set aside the jury's verdict, and order a new trial.  In general, the non-economic awards[8] range from a low of less than $100,000 to a high in excess of $3 million, with many cases grouped roughly in the $500,000 to $2.5 million range.  The precise facts underlying each award are not always evident from the authorities cited, but our research has not uncovered <u>any</u> cases involving the type of incongruous behavior discussed above, i.e., a plaintiff voluntarily associating with an alleged abuser for years into his adulthood, and conferring an honored role upon him in the most important events of his life.  That fact alone is sufficient to warrant a lower award here, if a new trial is not granted in its entirety.  As these precedents demonstrate, juries throughout the country have consistently made vastly lower awards to plaintiffs suffering injuries similar to, or in some cases more extensive than, those Mr. Mirlis alleges here. They further support a conclusion that the jury's award in this case is so excessive as to "shock the conscience".

In the *Doe v. Archdiocese* case, there was a claim of repeated abuse by a religious leader; $1,000,000 in compensatory damages was awarded (which may not have been entirely non-economic), a small fraction of the jury verdict here.  Similarly, in the *Blair* case, the plaintiff had symptoms far more extensive than those claimed by Mr. Mirlis, but received a non-economic award of $500,000.  The plaintiff in *Blair* was almost the exact same age as Mr. Mirlis is now.  Similarly, in the *Srb* case, which also involved multiple claims of sexual abuse by an authority

---

[8]   As noted in the case discussion, in some cases it is difficult to determine what portion of the compensatory damages was attributed to non-economic injury, and what portion for economic.

figure, the plaintiff also testified to symptoms more serious than those claimed by Mr. Mirlis. The total damage award was $1.27 million.

The two highest damage awards noted, in the *Doe v. Boy Scouts* and *B.K. v. Kelley* cases, still do not approach the exorbitant non-economic figure awarded by the jury here. Even if one assumes that the <u>entire</u> award in the *Boy Scouts* case ($7 million) is attributable to non-economic damage, it is still less than 50 per cent of the $15 million awarded in this case. Put otherwise, the verdict in this case exceeds the greatest "outlier" uncovered in our research by more than 100 per cent.

For all of these reasons, the Court should exercise its authority under Rule 59, and order a new trial in this matter. Indeed, in our view, a new trial, or in the alternative a remittitur, must be granted in order to remedy a clear mistake. The jury, while perhaps well-intentioned, simply reached a conclusion that cannot be justified by law, fact or precedent, but is best understood as the product of passion and emotion. Fortunately, our system of justice has built-in safeguards to ensure that such miscarriages of justice can, and should, be remedied. We urge the Court to use its remedial power, and either grant a new trial, or order a remittitur substantially below $1 million. This amount, in our view, fairly reflects the unusual testimony at trial, and the awards in similar cases discussed above.

## Conclusion

For the foregoing reasons, the Court should exercise its authority under Rule 59 and grant a new trial in this case.  In the alternative, a remittitur should be ordered, in an amount substantially less than $1 million.

**THE DEFENDANTS,**

By:  /s/ David T. Grudberg
      David T. Grudberg (ct01186)
      Amanda C. Nugent (ct27584)
      CARMODY TORRANCE SANDAK &
      HENNESSEY LLP
      195 Church Street, P.O. Box 1950
      New Haven, CT 06509-1950
      Telephone: (203) 777-5501
      Facsimile: (203) 784-3199
      E-mail:dgrudberg@carmodylaw.com
      E-mail: anugent@carmodylaw.com

      William J. Ward (ct10009)
      336 Torrington Rd.
      PO Box 430
      Litchfield, CT  06759
      Telephone:  (860) 567-2210
      Facsimile:  (860)567-2218
      E-mail:  billwardlaw@sbcglobal.net

      *Their Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify a copy of the foregoing Memorandum of Law in Support of Motion for New Trial or Remittitur was filed electronically on June 28, 2017.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

/s/ Amanda C. Nugent
Amanda C. Nugent
