UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELIYAHU MIRLIS,<br>    Plaintiff,<br><br>v.<br><br>DANIEL GREER, et al.<br>    Defendants | No. 3:16-cv-00678 (MPS) |

# RULING ON LAWRENCE DRESSLER'S REQUEST FOR ACCESS TO POST-JUDGMENT FINANCIAL DOCUMENTS AND TO VIDEO DEPOSITION PLAYED AT TRIAL

## I. Introduction

Plaintiff Eliyahu Mirlis brought this lawsuit against his former high school principal, Rabbi Daniel Greer, along with his former high school, Yeshiva of New Haven, Inc. ("Yeshiva"). Mirlis claimed that he was repeatedly sexually assaulted as a student at Yeshiva by Greer, and that the school failed to respond appropriately. On May 18, 2017, after a five-day trial, a jury agreed, awarding Mirlis $15,000,000 in damages. I earlier denied the defendants' post-verdict motions challenging the verdict, and the defendants have appealed the judgment. (*See* ECF No. 243 and 248). Before me now is non-party Lawrence Dressler's request for public access to "financial documents, deposition(s) and related financial information obtained during post-judgment discovery" from Daniel Greer and the Yeshiva of New Haven. (ECF No. 276 at 1; ECF No. 255 at 2). Dressler, who has created a blog on which he has posted information about this case, also requests the public release of the video deposition of fact witness Aviad Hack, which was played for the jury at trial. (ECF No. 276 at 1; ECF No. 255 at 5). Also before me is

1

Aviad Hack's motion for a protective order prohibiting the release of the video of his deposition. (ECF No. 256). For the reasons stated below, Dressler's request is GRANTED IN PART AND DENIED IN PART, and Hack's motion for a protective order is DENIED.

## II.   Background

A jury concluded that Mirlis proved each of his claims against Greer at trial and awarded him $15,000,000 in compensatory damages. (*See* ECF No. 157). The jury also concluded that punitive damages were warranted. (*Id.*). As a result, the Court issued a judgment awarding Mirlis $15,000,000 in compensatory damages, along with $5,000,000 in common law punitive damages, and offer-of-compromise interest in the amount of $1,749,041.10. (ECF No. 163). After the jury issued its verdict, Mirlis filed motions for an order directing the clerk to issue writs of execution (ECF No. 186) and to take Daniel Greer's deposition (ECF No. 187) in order to facilitate post-judgment discovery. Shortly thereafter, in response to an order I issued, the defendants filed their responses to Mirlis' post-judgment interrogatories—which concerned Greer's financial assets—on the docket under seal. (ECF No. 193 and 199).

On November 24, 2017, the court received a letter from Dressler requesting that the Court make publicly available any "financial documents, deposition(s) and related financial information obtained during post judgment discovery" from Daniel Greer[1] and the Yeshiva of New Haven. He also requested that the Court make publicly available the video of the deposition of fact witness Aviad Hack—which had been played in part for the jury at trial (*see* ECF No. 230 at 137). (Dressler Letter at 1).[2] Hack testified, among other things, that Greer had

---

[1] I understand Dressler's request as referring to any deposition of Greer taken for the purposes of facilitating post-judgment discovery, not to the deposition taken prior to trial.

2

sexually abused him while he was a minor and a student at the Yeshiva a few years before Mirlis attended, and also that Hack later learned—while he was a teacher at the Yeshiva—that Greer was abusing Mirlis. (ECF No. 111-6 at 8, 11-12) Neither the video of Hack's deposition itself nor a transcript of the deposition was marked as an exhibit or admitted in evidence during the trial. The transcript of the entire deposition, however, has been publicly available since the parties filed it on the docket before trial as an exhibit to their joint trial memorandum to facilitate the Court's ruling on the admissibility of the specific testimony they had designated. (*See* ECF No. 111-6).

In response to Dressler's letter, the Court issued a notice on the docket stating the gist of Dressler's letter and noting that there would be a hearing on the issue in the near future. (ECF No. 235). Hack later filed an opposition to Dressler's request, which he styled as a motion for a protective order prohibiting the release of the video of his deposition. (ECF No. 256). The defendants also filed an opposition (ECF No. 257), and Hack and the defendants filed supplemental briefs after the Court heard oral argument. (ECF No. 272 and 273).

**III.    Discussion**

The public's right to access documents related to the judicial process is protected by the common law and the First Amendment to the United States Constitution. The common law right of public access stems from "the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). "Before any such common law right can attach, however, a court

---

[2] The parties designated some but not all of Hack's videotaped deposition to be shown to the jury at trial. (*See* ECF No. 111-6). Certain portions of the designated sections, however, were not played for the jury based on my evidentiary rulings set out in ECF No. 144-146.

3

must first conclude that the documents at issue are . . . 'judicial documents.'" *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). A document is a judicial document if it is "relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 119 (internal quotation marks omitted). "Documents that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the [common law presumption of access's] reach. . . ." *Amodeo*, 71 F.3d at 1050.

Should a court conclude that "a document is a judicial document and therefore that at least a common law presumption of access applies, [the court] must determine the weight of the presumption of access." *United States v. Erie Cty., N.Y.*, 763 F.3d 235, 239 (2d Cir. 2014) (internal quotation marks omitted). This weight is in turn "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Amodeo*, 71 F.3d at 1049. After calculating the "weight of the presumption of access, the court must balance competing considerations against disclosure. Only when competing interests outweigh the presumption may access be denied." *Erie Cty*, 763 F.3d at 239, quoting *Lugosch*, 435 F.3d at 120. Such competing interests include adverse effects upon "law enforcement interests or judicial performance," along with "the privacy interest of the person resisting disclosure." *Amodeo*, 71 F.3d at 1050.

In addition to this common law right of access, "the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'" *Lugosch*, 435 F.3d at 120, quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004). The Second Circuit employs two approaches in defining the scope of this right. The first is the "so-called experience and logic approach," which "requires the court to consider both

4

whether the documents [at issue] have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." *Lugosch*, 435 F.3d at 120 (internal quotation marks omitted). "The courts that have undertaken this type of inquiry have generally invoked the common law right of access to judicial documents in support of finding a history of openness." *Hartford Courant*, 380 F.3d at 92. The second approach "considers the extent to which the judicial documents are 'derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings.'" *Lugosch*, 435 F.3d at 120, quoting *Hartford Courant Co.*, 380 F.3d at 93. This approach "derives from the public nature of particular tribunals." *Hartford Courant Co.*, 390 F.3d at 93. If a court concludes that a First Amendment right of access to certain judicial documents exists, it must still determine whether the documents should be sealed. A document may only be "sealed if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987).

    **a. Financial Documents, Deposition(s) and Related Information Obtained During Post-Judgment Discovery**

I begin with Dressler's request to make publicly available the financial documents, deposition(s) and related information obtained from Greer and the Yeshiva during post-judgment discovery. For the following reasons, I deny Dressler's request for this information. First, the information at issue is mainly comprised of discovery materials passed between the parties beyond the Court's reach, thereby rendering them non-judicial documents. *Amodeo*, 71 F.3d at 1050; *S.E.C. v. TheStreet.Com*, 273 F.3d 222, 233 (2d Cir. 2001) (noting that "deposition discovery material" did not constitute a judicial document because it did not "play [any] role in

5

the performance of Article III functions" (internal quotation marks omitted)). The only portion of these documents even posted on the docket are the defendants' responses to post-judgment interrogatories, which were filed under seal in response to an order I issued to ensure that the parties proceeded promptly with any necessary post-judgment discovery. (ECF No. 199). As such, even these interrogatories do not constitute a judicial document as they were not "relevant to the performance of the judicial function and useful in the judicial process." *TheStreet.Com*, 273 F.3d at 231. Rather, like other discovery material passed between the parties, they were merely useful to facilitate the post-judgment process; they were never considered by the Court in performing its Article III functions.

Even assuming that the financial information Dressler sought was contained in judicial documents, I would still deny his request to make it publicly available. As an initial matter, Dressler does not enjoy a First Amendment right of access to such documents. Financial documents produced in discovery have not "historically been open to the press and general public" nor has their public access "play[ed] a significant positive role in the functioning of the particular process in question" in this case—to wit, the Court's overseeing, as necessary, the plaintiff's efforts to collect his judgment. Indeed, financial information has historically "not been subject to public access in the United States" because "[c]ourts have recognized that banking customers have a 'justifiable expectation of privacy that their names and financial records not be revealed to the public.'" *Strauss v. Credit Lyonnais*, S.A., No. 06-CV-702 DLI MDG, 2011 WL 4736359, at *4 (E.D.N.Y. Oct. 6, 2011) (quoting *In re Knoxville News-Sentinel Company, Inc.*, 723 F.2d 470, 477 (6th Cir. 1983)). I also do not discern any way in which this information could be derived from or a necessary corollary of the capacity to attend the relevant

proceedings. The defendants' financial documents are not likely to be relevant to any future proceedings, if there are any, but rather merely to the satisfaction of the judgment against them.

That leaves Dressler with the common law right of access—again, even assuming the financial records of Greer and the Yeshiva are judicial documents. This doctrine proves no more helpful to his request than the First Amendment. The common law presumption of access to judicial documents is routinely overcome when the documents at issue concern a party's personal financial information. *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 629 (S.D.N.Y. 2011) ("Indeed, most of the cases in which courts have concluded that the privacy interests of individuals were sufficient to overcome the presumption of access involve illness or sensitive personal financial information."); *Prescient Acquisition Grp., Inc. v. MJ Pub. Tr.*, 487 F. Supp. 2d 374, 377 (S.D.N.Y. 2007) (granting motion to seal two bank checks due to "concern that no party be subjected to a grave risk of personal danger or financial fraud by reason of their status as a defendant in a civil lawsuit"). As such, Dressler's request would fail even if the information he requested was contained in judicial documents.

For these reasons, I deny Dressler's request to make the defendants' post-judgment deposition(s) and financial discovery publicly accessible.

**b. Video of Aviad Hack's Deposition**

Dressler stands on firmer footing with his request for the video of Hack's deposition testimony, which was played in part for the jury at trial. I first address the portion of the video that was played for the jury at trial and relied upon by the jurors in rendering their decision. The video of the deposition that was played for the jurors at trial and considered by them in rendering their decision is a judicial document. *See Application of CBS, Inc.*, 828 F.2d 958, 960 (2d Cir. 1987) (holding that "the common law right to inspect and copy judicial records applies to

videotaped depositions of witnesses"); *United States v. Graham*, 257 F.3d 143, 151 n. 3 (2d Cir. 2001) ("Although the word 'documents' might normally suggest that the common law right applied only to written material, it has been held to apply to audio and video tapes."). Further, the Second Circuit has held repeatedly that the common law presumption of access is at its apogee with respect to evidence presented at trial. *See Amodeo*, 71 F.3d at 1049 ("We have also consistently held that the public has an especially strong right of access to evidence introduced in trials." (internal quotation marks omitted)); *Application of Nat'l Broad. Co., Inc.*, 635 F.2d 945, 952 (2d Cir. 1980) ("*Myers*") ("Once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction.").

A key case on this issue is *Application of CBS, Inc.*, 828 F.2d 958 (2d Cir. 1987). *CBS* concerned a television network's application "to copy for possible broadcast a videotaped deposition of a witness previously shown to a jury in open court during" an ongoing trial. *Id.* at 958. The witness could not testify at trial due to illness and his videotaped testimony consisted mainly of his confession to committing various criminal acts on behalf of organized groups. *Id.* at 959. The district court had denied the application. *Id.* The Second Circuit reversed on the basis "that the common law right to inspect and copy judicial records applies to any item entered into evidence at a public session of a trial, excluding only those items entered under seal, but not distinguishing evidence on the basis of whether it was real or testimonial." *Id*. (internal quotation marks and emphasis omitted). While the court "sympathize[d] with the district court's concern for preserving the dignity of a witness, [it saw] nothing sufficiently compelling" about

8

the witness's evident illness or the embarrassment of his admissions to various illegal activities to warrant barring the release of the video to the public. *Id.* at 961.

The *CBS* court also spoke to the possibility of providing a transcript rather than a video of the witness's deposition, concluding that the former was vastly inferior to the latter. *Id.* at 960. In reaching this conclusion, the court noted that "[t]ranscripts lack a tone of voice, frequently misreport words and often contain distorting ambiguities as to where sentences begin and end." *Id.* By contrast, "[v]ideotaped depositions . . . convey the meaning of testimony more accurately and preserve demeanor evidence as well." *Id.* at 960; *see also Stern v. Cosby*, 529 F. Supp. 2d 417, 421 n. 4 (S.D.N.Y. 2007) ("Once a video deposition is shown in open court at trial, however, it becomes a matter of public record and is to be made accessible to the public, except in the 'most extraordinary circumstances.'" (quoting *In re CBS, Inc.*, 828 F.2d 958, 959 (2d Cir. 1987)).

The defendants contend that the *CBS* case does not apply to the video of Hack's deposition because the "excerpted Hack video deposition transcripts were never marked as an exhibit, nor separately received into evidence. . . ." (*See* ECF No. 272 at 1). This argument contains no merit. In *United States v. Graham*, the Second Circuit confronted the question of whether video and audio tapes played at a pre-trial detention hearing but not entered into evidence were judicial records subject to the strong presumption of public access noted in the *Myers* and *CBS* cases. 257 F.3d 143, 145, 149 (2d Cir. 2001). The defendants argued that "because the tapes played at the pretrial detention hearing were not entered into evidence, they [were] not 'judicial records'" subject to the presumption. *Id.* at 151. The Second Circuit rejected this argument, concluding that "while the defendants [were] correct that the words 'admitted into evidence' were not used at the hearing, the distinction appear[ed] to be at most a semantic one,

9

given the presentation of the tapes at the hearing and the district court's reliance on them in making its decision." *Id.* at 152. The Court reasoned that "just as a member of the public sitting in the courtroom might observe the presentation of evidence as to which an objection is made and sustained as well as evidence which is admitted, it makes sense that the definition of a 'judicial document' would extend to any material presented in a public session of court relevant to the performance of the judicial function and useful in the judicial process whether or not it was formally admitted." *Id.* at 153 (internal quotation marks omitted). The policy behind this robust common law right, the court noted, is "that what transpires in the courtroom is public property." *Id.* (quoting *Smith v. U.S. Dist. Court for S. Dist. of Illinois*, 956 F.2d 647, 650 (7th Cir. 1992)).

Applying this analysis, the *Graham* court determined that the question of whether the tapes were judicial documents turned on the same inquiry as it would for any other document— "whether they [were] relevant to the performance of the judicial function and useful in the judicial process." *Id.* at 153 (internal quotations omitted). The court concluded that the tapes were judicial documents because they "were instrumental in [the lower court's] decision to detain the defendant" and were "the focal point of the court's decision." *Id.* The court also noted that the "decision whether to detain the defendants obviously constituted a determination of the defendant's 'substantive rights.'" *Id.* After concluding that the tapes were judicial documents, the court addressed the weight of the presumption of public access. Since the tapes at issue "clearly directly affect[ed] an adjudication and were material to the district court's determination of the defendant's substantive rights," the strong presumption of access from the *Myers* case applied. *Id.* at 154 (internal quotation marks omitted).

10

Here, the video of Hack's deposition at trial served a significant judicial function and directly affected the adjudication at hand. Hack's testimony directly supported Mirlis' account with respect to Greer's liability—he stated that he knew that Greer was abusing Mirlis at the time that it was taking place. (*See* ECF No. 111-6 at 11).[3] He noted that Greer had told him as much. (*Id.* at 11-12). Hack was one of only two witnesses who directly corroborated Mirlis' allegations as to liability—the other was Mirlis' wife, Shira Mirlis, who testified that Mirlis told her about Greer's abuse after he had left the Yeshiva. (*See* ECF No. 230 at 142). Hack also stated that Greer had abused him in a similar manner as alleged by Mirlis. (*See* ECF No. 111-6 at 8-9). In addition, I granted the jurors' request to view a portion of Hack's video testimony again during their deliberations. (*See* ECF No. 234 at 535). As such, the jurors likely relied upon Hack's deposition testimony in rendering their verdict. It is therefore subject to the strong presumption of access outlined in the *Myers* and *CBS* cases.

Although Aviad Hack's video testimony concerns sexual abuse of a minor, I do not find that the content of the video amounts to the sort of "extraordinary circumstance" that would justify keeping it from the public under the *Graham-CBS* framework. The archetypical extraordinary case concerned a video far more gruesome than Hack's testimony. *See In re KSTP Television*, 504 F. Supp. 360 (D. Minn.1980) (denying release of videos made by kidnapper of blindfolded and bound rape victim introduced at trial); *Application of CBS, Inc.*, 828 F.2d at 961 (comparing witness's potential embarrassment due to videotaped deposition testimony to that of the victim in the *KSTP Television* case). While Hack's deposition testimony

---

[3] As noted above, the parties designated the portions of Hack's deposition that they wished to show to the jury in their joint trial memorandum. The Court then ruled on the parties' objections to the designations. (*See* ECF No. 144). The portions of Hack's testimony cited in this ruling were allowed in and shown to the jury.

11

concerned sexual crimes against him, it is not analogous to the video actually showing the suffering of a bound rape victim at issue in the *KSTP Television* case. Although the video displays Hack discussing his abuse at the hands of Greer, it does not display this abuse.

In his opposition to the release of the video, Hack emphasizes that his privacy interest is strong given that he is an innocent third party victim of Greer. (ECF No. 256 at 3-4; ECF No. 273 at 2). While there is considerable case law supporting this position, *see, e.g.*, *Application of CBS, Inc.*, 828 F.2d at 961 (noting in granting public access to the witness's testimony that he was "not an innocent bystander subject to public embarrassment solely because of the acts of others" but rather that "the circumstances in which he finds himself are solely the result of his criminal acts"); *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 CIV. 3824, 2017 WL 374735, at *2 (S.D.N.Y. Jan. 26, 2017) ("Courts have held that [t]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation." (internal quotation marks omitted)), there are considerable countervailing factors that diminish Hack's privacy interest in this instance.

First, as noted above, in addition to being played for the jury and spectators at the trial, Hack's testimony has already been released in transcript form in its entirety to the public in the parties' prior filings. (ECF No. 255 at 5; ECF No. 111-6, Exhibit F). Not surprisingly, then, the details of Hack's deposition, including his allegations of abuse against Greer, have already received press coverage. *See, e.g.*, Paul Bass, *2nd Rabbi Accuser Details Alleged Abuse*, New Haven Independent, April 16, 2017, *available at* http://www.newhavenindependent.org/index.php/archives/entry/daniel_greer_avi_hack/ (discussing Aviad Hack's deposition in detail, including allegations of abuse against Greer); Rich Scinto, *Sex Abuse Alleged Against New Haven Rabbi*, New Haven Patch, April 17, 2017,

12

*available at* https://patch.com/connecticut/newhaven/sex-abuse-alleged-again-against-new-haven-rabbi (same). Given that the press has already published and commented upon most of the information elicited from the portions of Hack's deposition at issue, his privacy interest in the video of the deposition is significantly diminished.[4]

Second, Hack effectively consented to the publication of his deposition testimony when he agreed—through his counsel—to the deposition without requesting the use of a pseudonym or seeking any restrictions upon its presentation as evidence in a public courtroom. *Compare Doe No. 2 v. Kolko*, 242 F.R.D. 193, 199 (E.D.N.Y. 2006) (allowing plaintiff alleging he was abused as a minor to proceed anonymously). Hack's attorney did not seek a protective order to prevent or restrict the airing of his video deposition at the trial—where it was viewed by both jurors and a sizable audience, including representatives of the media—and has not sought to seal the transcript of Hack's testimony posted on the docket. Also, unlike the witness in the *CBS* case, Hack had the ability to testify at trial—which would have obviated the need to present his testimony by video—but elected not to. (*See* ECF No. 236, Exhibit G (describing Hack's successful attempt to evade service of a subpoena requiring him to testify at trial.)) Thus, the fact that the video of the deposition was played at trial at all was due to Hack's decision to evade

---

[4] The extensive press commentary concerning Hack's deposition also cuts against the defendants' argument in their opposition that releasing the video of Hack's deposition testimony could potentially affect Greer's upcoming state court criminal trial. (ECF No. 257 at 3-4). Further, as discussed at oral argument, that trial has not yet been scheduled, and there are other mechanisms—including the individualized voir dire of prospective jurors to which litigants are entitled in Connecticut state court, *see* Conn. Const. art. I, § 19 ("The right to question each juror individually by counsel shall be inviolate.")—that will reduce the risk that pretrial publicity will improperly affect the jury. *See Myers*, 635 F.2d at 953 (rejecting defendants' argument that release of videotapes entered into evidence in trial would poison jury pool for subsequent trials in part on basis that "[t]he opportunity for voir dire examination still remains a sufficient device to eliminate from jury service those so affected by exposure to pre-trial publicity that they cannot fairly decide issues of guilt or innocence").

service, as all parties in the case sought to compel him to testify in person. For these reasons, Hack's privacy interest, while still considerable, does not constitute the sort of "extraordinary circumstance" that would justify denying the release to the public of the portions of the video shown at trial.

The portion of the video of the deposition *not* shown at trial is a different story. As an initial matter, this portion does not constitute a judicial document. *See Stern*, 529 F. Supp. at 421 (holding that video of deposition not shown at trial was not a judicial document). As such, there is no presumption of public access to it. *See Lugosch*, 435 F.3d at 120. This does not end the inquiry, as the question of whether the public should have access to the documents remains. Without the presumption in favor of public access, however, I am left with the unchecked concerns on the part of Hack described previously. *See Stern*, 529 F. Supp. 2d at 422 (denying release of video of deposition not shown to jury at trial in light of witness's strong privacy interest). Considering Hack's remaining privacy interest in avoiding publication of the entire video, on, say, the Internet, I deny Dressler's request with respect to the portions of the video not shown to the jury at trial.

For these reasons, Dressler's request to release the video of the deposition of Aviad Hack is granted with respect to those portions shown to the jury at trial. It is denied with respect to all other parts. Since the video of Aviad Hack's deposition is currently in the custody of Mirlis' counsel, Mirlis' counsel shall create a facsimile of this video containing only those portions shown at trial. He shall then provide this facsimile to Dressler. Dressler, as the requesting party, shall bear the costs of this process, and at the option of Mirlis' counsel, may be required to prepay those costs before the copy is produced. Given the fact that it will be impossible to undo the publication of the video in question, however, the Court will stay this order to allow the

14

defendants and/or Hack to file an appeal and seek a further stay from the United States Court of Appeals for the Second Circuit. *See United States v. Westchester Cty., New York*, No. 06 CIV. 2860 (DLC), 2016 WL 3566236, at *11 (S.D.N.Y. June 27, 2016) (noting in granting stay pending appeal of order requiring release of videos that "once the videotapes are made public, it will be impossible to re-seal them effectively"). This interim stay will be in effect for a period of **twenty-one days** following the filing of this order. If, within twenty-one days, the defendants and/or Hack file a notice of appeal and move for a stay at the Second Circuit, *see* Fed. R. App. P. 8, this Court's interim stay shall remain in effect until the Second Circuit's disposition of the motion. If no appeal or motion is filed, the order will go into effect at the end of the twenty-one day period.

Finally, because the video deposition of Hack's testimony was not marked or admitted as an exhibit or captured in the trial transcript, there appears to be a need to supplement the appellate record. Indeed, the defendants note in their supplemental brief that they "intend to move to submit a redacted deposition transcript of Mr. Hack, tracking those portions ruled admissible by the Court" for the purposes of "clarifying and supplementing the trial record for appeal. . . ." (ECF No. 272 at 2). I am inclined to grant that motion, *see* F. R. App. P. 10(e)(2)(B), but will give the plaintiff **fourteen days** from the filing of this order to object. If the plaintiff does not file an objection on the docket within the fourteen-day period, the Court will grant the defendants' motion.

IV.     **Conclusion**

For the reasons discussed above, Dressler's request is GRANTED IN PART AND DENIED IN PART. Dressler's request to release the video of the deposition of Aviad Hack is granted with respect to those portions shown to the jury at trial. His request is denied with

15

respect to all other requested materials.  In light of this disposition, Hack's motion for a protective (ECF No. 256) order is hereby DENIED.  Mirlis' counsel shall create a facsimile of the video containing only those portions shown at trial.  Dressler, as the requesting party, shall bear the costs of this process.  Further, this order shall be stayed for twenty-one days to allow the defendants and/or Hack to file an appeal and seek a further stay from the United States Court of Appeals for the Second Circuit.  If, within twenty-one days, the defendants and/or Hack move for a stay at the Second Circuit, this Court's interim stay shall remain in effect until the Second Circuit's disposition of the motion.  If no motion is filed with the Court of Appeals, the order will go into effect at the end of the twenty-one day period.  Finally, I will grant the defendants' motion to supplement the appellate record by ordering them to file on the docket a redacted deposition transcript of Hack's testimony, tracking those portions ruled admissible by the Court, unless the plaintiff objects within fourteen (14) days of the filing of this order.
.

                      IT IS SO ORDERED.

                      /s/

                      Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut

            January 26, 2018